**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MISTY ROBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 07 C 4520** |
| | ) | |
| **CWI. INC. d/b/a CAMPING WORLD,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant CWI, Inc. d/b/a Camping World,

Inc.'s ("CW") motion for summary judgment. For the reasons stated below, we grant

the motion for summary judgment in its entirety.

## BACKGROUND

Plaintiff Misty Roby ("Roby") alleges that she began working for CW as a

cashier in May 2005. Roby contends that her supervisor, Joe Schiavone

("Schiavone"), began making sexually suggestive statements to Roby. On one

occasion, Schiavone allegedly kneeled down near Roby's legs and when Roby asked

1

if she should move, Schiavone allegedly responded: "I like it down here." (Compl. Par. 5). According to Roby, on another occasion Schiavone came up behind Roby and pressed his body against her body. Roby contends that in July 2005 she took maternity leave and, while Roby was on leave, Schiavone told another CW employee that after Roby returned to work Schiavone would "either lose his job or lose his wife because he wanted to be romantically and sexually involved with Roby." (Compl. Par. 7). On another occasion, Schiavone allegedly "smacked Roby on the buttocks." (Compl. Par. 10). Roby allegedly requested to work a different shift from Schiavone, but she was allegedly assigned the store closing shift with Schiavone. Roby states that she complained to management, but was only told not to discuss the situation with anyone else at work. Schiavone allegedly told other CW employees that Roby was trying to get him fired. Schiavone allegedly intimidated and taunted Roby and told Roby that nothing would happen to him because he is a "Mason." (Compl. Par. 13). Roby also contends that after she complained about Schiavone, on one occasion he placed his hand on her hip. Roby contends that on January 28, 2006, CW terminated Roby's employment. Roby brought the instant action and includes in her complaint a hostile work environment claim based on an alleged violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I), and a Title VII retaliation claim (Count II). CW moves for summary judgment on

both claims.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of

material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

I.  Whether Schiavone was Roby's Supervisor

We note that CW initially argues in a conclusory fashion that Schiavone was technically not Roby's supervisor since he did not have the authority to hire, fire, demote, or promote Roby. (Mem. SJ 8). CW asserts that Tim Heaton ("Heaton") was Roby's direct supervisor. (Mem. SJ 1). Roby responds by pointing to portions of the record indicating that she and other employees in the same position had a reasonable basis to conclude that Schiavone was Roby's supervisor. (Ans. SJ 9). CW did not support its argument that Schiavone was not Roby's supervisor. CW instead argued in its memorandum that whether Schiavone was Roby's supervisor is irrelevant and that, even if Schiavone was Roby's supervisor, under the analysis for

supervisor liability, Roby cannot prevail. (Mem. SJ 8). Thus, for the purposes of the instant motion we will treat Schiavone as Roby's supervisor.


## II.  Hostile Work Environment Claim

CW moves for summary judgment on the hostile work environment claim. CW argues that it cannot be held liable since there is not sufficient evidence that shows that CW failed to respond to complaints about the alleged harassment. CW asserts that it cannot be held liable for Schiavone's alleged misconduct even if he were considered to have been Roby's supervisor. An employer is "vicariously liable for hostile environment harassment perpetrated by a supervisor." *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 951 (7th Cir. 2005)(citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). However, if the employee that was harassed by the supervisor did not suffer a tangible employment action, the employer can raise an affirmative defense known as the *Ellerth/Faragher* affirmative defense. *Id.*; *Jackson v. County of Racine*, 474 F.3d 493, 502 (7th Cir. 2007)(referring to the "*Ellerth/Faragher* affirmative defense"); *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004)(indicating that if no tangible action was taken by the employer, the employer can raise the *Ellerth/Faragher* affirmative defense). For the *Ellerth/Faragher*

affirmative defense, the defendant employer must establish: (1) "'that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and'" (2) "'that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Cerros*, 398 F.3d at 951-52 (quoting *Ellerth*, 524 U.S. at 754).

### A.  Tangible Employment Action

Roby argues that CW cannot raise the *Ellerth/Faragher* affirmative defense because CW took a tangible employment action against her.  A tangible employment action can constitute actions such as "'discharge, demotion, or undesirable reassignment'. . . ." *Jackson*, 474 F.3d at 501 (quoting *Hill v. American General Finance, Inc.*, 218 F.3d 639, 643 (7th Cir. 2000)).

### 1.  Termination of Employment

Roby first contends that she suffered a tangible employment action because she was discharged from her employment and her employment was allegedly terminated by CW in January 2006.  (Compl. Par. 14); (SAF Par. 25-26).  However, CW points to evidence that indicates that Roby's employment was not terminated in

January 2006 and that she actually abandoned her employment.  We first note that in some of Roby's filings she actually concedes that she was never officially fired by CW in January 2006 and Roby's position is that she was instead constructively discharged.  (R SF Par. 60).  For example, in response to CW's assertion in its statement of facts that Roby quit her job, Roby responds that "[i]t is denied that Roby quit working" and that "rather, she was effectively taken off schedule [sic] and constructively discharged. . . ."  (R SF Par. 60).  Thus, Roby's own filings contradict her assertion that CW fired her in January 2006 and forced Roby to quit working at CW.

Also, Roby's own deposition testimony indicates that CW did not terminate her employment in January 2006.  For example, Roby admitted that no one at CW ever communicated to her that she was fired or that her employment had been terminated.  (Roby Dep. 104).  Roby also contends that she had some confusion concerning her status as being on or off the work schedule, but she admitted at her deposition that she understood it to be "some sort of leave," as opposed to being permanently terminated.  (Roby Dep. 104).  Roby testified during her deposition that she was so upset with her situation at work that she "didn't want to go to work anymore," which indicates she was not fired by CW.  (Roby Dep. 76).  When asked if she told anyone that she quit her job, she replied only that she did not remember.

(Roby Dep. 105).  In describing her departure from CW, Roby did not state that she was fired or forced to leave CW but instead stated: "I did leave."  (Roby Dep. 105).

In addition, CW has pointed to undisputed evidence that shows that Roby's employment was not terminated by CW in January 2006.  It is undisputed that Roby spoke with Human Resources Manager, Sarah Sack ("Sack") in early January 2006 and that Roby informed Sack that Roby had retained a lawyer to pursue a suit against CW.  (R SF Par. 65).  CW also contends that Sack told Roby at that juncture that Roby was on the work schedule.  (SF Par. 65).  Roby contends that Sack never told Roby that Roby was on the work schedule, but in support of her denial, Roby cites only to page 60 of her deposition transcript.  (R SF Par. 65).  We note that Roby indicates on page 61 of her deposition transcript that she does not recall "anyone inviting [her] back."  (Roby Dep. 60-61).  Roby does not, however, offer any testimony at that point in her deposition or in the portion cited by Roby that contradicts the fact that Sack told Roby that Roby was on the work schedule.  Therefore, such fact is deemed undisputed pursuant to Local Rule 56.1.  *See Martino v. MCI Communications Servs., Inc.*, 2008 WL 2157170, at *1 (N.D. Ill. 2008)(stating that a "Court may disregard statements and responses that do not properly cite to the record"); *Dent v. Bestfoods*, 2003 WL 22025008, at *1 n.1 (N.D. Ill. 2003)(indicating that a denial is improper if the denial is not accompanied by

specific references to admissible evidence or portions of the record representing admissible evidence).

CW also asserts in Paragraph 67 ("Paragraph 67") of its statement of material facts that Heaton "continued to place Roby on the weekly store schedules for her regular working hours through the end of January 2006," and that after January 2006, "Roby remained on the weekly store schedules, though scheduled 'off' until at least early March 2006." (SF Par. 67). CW has in fact attached copies of the CW work schedules during the period that show that Roby was listed on certain shifts at CW. (CW Ex. J). Roby responds to Paragraph 67 by indicating that she "denie[s]" that she was listed on the work schedules, but the basis for her denial is only that she allegedly was informed that she was not scheduled to work and would be listed as "off." (R SF Par. 67). As indicated above, it is undisputed that Sack told Roby that she was on the work schedule. Also, Roby's evasive answer to Paragraph 67 that she was not told that she was scheduled to work and was listed as "off" does not offer a basis to contest CW's assertion that Roby was listed on the work schedules and the facts in Paragraph 67 are therefore deemed to be undisputed. *See Martino*, 2008 WL 2157170, at *1 (stating that "[t]he requirements for responses under Local Rule 56.1 are 'not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted'")(quoting in part *Bordelon v. Chicago Sch. Reform Bd. of*

*Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)); *Jankovich v. Exelon Corp.,* 2003 WL 260714, at *5 (N.D. Ill. 2003)(stating a denial of a statement of fact that is evasive and does not directly oppose the assertion is improper and thus the contested fact is deemed admitted pursuant to Local Rule 56.1).

CW also asserts that after January 2006, CW "continued to pay Roby her regular wages through early February 2006, as if she were working." (SF Par. 68). Roby admits that those facts are true. (R SF Par. 68). Roby also admits that she did not know of any other employee that had been paid even though the employee had not been coming to work. (R SF Par. 68). CW also presents evidence that shows that Roby was kept as an "active" status on the payroll system at least through September 2007, which left open the door for her return. (SF Par. 70). Thus, although Roby argues that her employment had been terminated in January 2006, she admits that she did not know for certain whether her employment had been terminated. She also admits that she did not want to work at CW anymore, that she is unsure if she told others that she quit, and that she left CW. It is also undisputed that Roby was told that she was on the work schedules, that she was listed on certain shifts on the work schedules after she spoke to Sack in January 2006, and that Roby was being paid for such hours. In opposition to the undisputed evidence pointed to by CW, showing that it did not terminate Roby's employment in January 2006, Roby

offers nothing more that her own self-serving assertions concerning her subjective

understanding of the situation.  We recognize that self-serving testimony by a

plaintiff can at times create genuine disputes as to material facts, if, for example,

such testimony relates to what the plaintiff saw or heard or plaintiff's personal

knowledge.  *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d

659, 664-65 (7th Cir. 2006).  However, self-serving beliefs by a plaintiff cannot

create genuine disputes where the beliefs are not premised on a personal knowledge

or any legitimate basis.  *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir.

2007)(stating that "[i]t is unfathomable that a company claiming to have engaged in

thousands of dollars of sales of a product for more than a decade would be unable to

produce even a single purchase order or invoice as proof" and that "[s]elf-serving

deposition testimony is not enough to defeat a motion for summary judgment");

*Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)(stating that "[a]lthough a

nonmoving party's own deposition may constitute affirmative evidence to defeat

summary judgment, conclusory statements in the deposition do not create an issue of

fact"); *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)(indicating that self-

serving statements must be based on personal knowledge and "although personal

knowledge may include reasonable inferences, those inferences must be 'grounded in

observation or other first-hand personal experience" and "[t]hey must not be flights

of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience'")(quoting in part *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991)).  Roby's assertion that in light of what she observed in January 2006, she "took [that] to mean that she was fired," is not sufficient to create a genuine dispute as to whether CW fired her in January 2006.  (Ans. SJ 10).  Nor has Roby pointed to other evidence that would be sufficient to indicate that her employment was terminated in January 2006.  Therefore, based on the undisputed record there is not sufficient evidence to conclude that CW terminated Roby's employment in January 2006.

### 2.  Constructive Discharge

Roby, apparently recognizing the lack of evidence to support her contention that her employment was terminated in January 2006, argues that even if CW did not terminate her employment, she was constructively discharged.  (Ans. SJ 10).  In order for a plaintiff "to show that a hostile work environment resulted in her constructive discharge," the plaintiff "must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her resignation was an appropriate response."  *McPherson*, 379 F.3d at 440.  An employee can be deemed to be constructively discharged only in a

situation "'in which the working conditions have made remaining with this employer simply intolerable.'" *Id.* (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)).

Roby points to evidence that she contends shows that she was subjected to a hostile work environment. However, for a constructive discharge, the working conditions for the plaintiff "'must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress.'" *Id.* (quoting *Robinson,* 351 F.3d at 336). Roby contends that there is evidence that Schiavone sexually harassed her, that she was taunted by Schiavone after she complained about him. (Ans. SJ 10). Roby contends that she felt intimidated and threatened by her situation at work. However, Roby has not pointed to sufficient evidence that, even if true, could be considered intolerable. Roby does not, for instance, indicate that Schiavone made any physical threats to her or threatened her employment. Roby merely contends, for example, that she was taunted by Schiavone and that he stared at her.

Roby also contends that her work environment was harsh because she was forced to "continually work in close proximity with" Schiavone. (Ans SJ 10). However, the undisputed facts do not support Roby's assertion. It is undisputed that Schiavone was a Service Manager. (R SF Par. 13). It is also undisputed that

Schiavone had a variety of responsibilities as a Service Manager that would have required him to perform tasks that were not in close proximity to the person of Roby. (R SF Par. 18). Roby has failed in turn to point to sufficient evidence that would support her contention that she "continually work[ed] in close proximity" with Schiavone. (Ans. SJ 10). Roby's allegations concerning harassment involve only a few isolated incidents and such allegations do not illustrate that Schiavone was continually working alongside Roby.

Roby also argues that "she did not feel comfortable working at Camping World anymore," (Ans. SJ 10), but as indicated above, an employee is not constructively discharged merely because she no longer feels comfortable with her workplace. Rather, the conditions must be "simply intolerable." *McPherson*, 379 F.3d at 440. Even when considering the evidence in the record in its totality, Roby has not shown that her work conditions were that harsh. Although Roby no longer works for CW, the undisputed evidence clearly shows that after CW had addressed the alleged harassment, Roby was given every opportunity to continue working and instead abandoned her job. Thus, there is not sufficient evidence to conclude that Roby was constructively discharged, and based on the above, there is not sufficient evidence that shows that CW took a tangible employment action against Roby. CW can therefore raise the *Ellerth/Faragher* affirmative defense.

## B. Exercise of Reasonable Care by CW

CW argues that the undisputed evidence shows that it exercised reasonable care in preventing and correcting the alleged harassing behavior by Schiavone towards Roby. An employer is not deemed to possess knowledge of the sexual harassment of the plaintiff until "'the employee makes a concerted effort to inform the employer that a problem exists.'" *McPherson*, 379 F.3d at 441 (quoting in part *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999)); *Cerros*, 398 F.3d at 952 (stating that "[a]t bottom, the employer's knowledge of the misconduct is what is critical, not how the employer came to have that knowledge" and that "[t]he relevant inquiry is therefore whether the employee adequately alerted her employer to the harassment"). The Seventh Circuit has indicated that an employer can meet its burden to exercise reasonable care in preventing and correcting harassing behavior by showing that "[a]s soon as [the employer] learned that [the harasser] had sexually harassed [the plaintiff], the [employer] acted immediately to investigate, correct and prevent future recurrences of [the harasser's] behavior." *McPherson*, 379 F.3d at 441.

According to Roby's own version of events, in early November 2005, she was having a conversation with Laura Phillips ("Phillips") and Roby was telling Phillips about Schiavone's alleged harassment. (R SF Par. 20). Roby contends that Phillips

was encouraging Roby to report Schiavone's alleged misconduct to Karl Ziarko ("Ziarko") and Heaton, and that when Ziarko and Heaton overheard Roby's comments, and became involved in the conversation, Roby complained to them about Schiavone. (R SF Par. 20). Roby admits that Ziarko then asked Roby to follow him and Heaton to the office to discuss her comments and that they did discuss Roby's complaints about Schiavone. (R SF Par. 20-21).

Roby also acknowledges that after she told Ziarko about the alleged harassment by Schiavone, Ziarko immediately contacted CW's Human Resources Department and relayed Roby's allegations to Sack. (R SF Par. 28). Roby argues that Ziarko's response was not timely because Roby's contends that Ziarko was aware of Schiavone's inappropriate conduct towards Roby at an earlier time. (R SF Par. 21, 28). Roby contends that Christopher Gartzke ("Gartzke") made a comment to Ziarko prior to November 2005. (R SF Par. 21, 28).

Gartzke indicated during his deposition and Roby confirmed during her deposition, that Gartzke told Ziarko that Schiavone "was either going to lose his job or his wife because he wanted to be with" Roby. (Roby Dep. 65);(Gart. Dep. 15-17). However, even if Gartzke had relayed the comment to Ziarko, the comment was not such that Ziarko should have been aware of unlawful harassment by Schiavone. Schiavone's comment indicated nothing more than that there was a romantic interest.

Also, the alleged representation to Ziarko did not come from Roby. Roby does not

contend that she complained to Ziarko before November 2005. Rather the comment

amounted to nothing more than gossip by another employee at CW that was neither

the alleged harasser nor the victim. It was a comment from a third party, and the

comment did not indicate whether the person commenting actually observed

Schiavone engage in any harassing conduct towards Roby. We also note that Roby

has not shown that such information would be admissible evidence and not barred as

hearsay. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir.

2007)(stating that "[t]he evidence relied upon in defending a motion for summary

judgment must be competent evidence of a type otherwise admissible at trial"); Fed.

R. Evid. 801. Thus, Roby has not pointed to evidence that shows that Ziarko knew

about the alleged harassment before November 2005 and failed to act immediately.

CW asserts that when Ziarko reported the alleged harassment to Sack in

November 2005, Sack immediately began an investigation. Roby denies that fact

and gives as her reason for her denial that there is no written procedure or guidelines

as to how to conduct an investigation. (R SF Par. 30). Roby, however, fails to

contest the fact that Sack did immediately begin some type of an investigation. It is

undisputed that Sack conducted an investigation and concluded that Schiavone had

not engaged in conduct that rose to the level of unlawful harassment. (R SF Par. 43-

17

44). CW has provided documentation, that shows that Schiavone received a stern written warning. (SF Par. 45). CW also points to evidence that shows that Schiavone was forced to undergo anti-harassment training and re-review the anti-harassment policy at CW ("Harassment Policy"). (SF Par. 46). CW also points to evidence that shows that it was conveyed to Schiavone that if he retaliated against Roby or there were further harassment problems, he would likely face termination. (SF Par. 47). Roby believes that the warning could not have been stern and that Schiavone could not have faced possible termination since there were further incidents. According to Roby, Schiavone taunted Roby and continued to harass Roby after the warning. (R SF Par. 45, 47). However, whether Schiavone actually took the warnings seriously is not the relevant issue. The relevant issue for the purposes of determining whether CW exercised reasonable care to address and prevent the harassment is the action taken by CW, and CW has shown that it did take reasonable steps to correct the problem. CW has also pointed to evidence that shows that CW took steps to make Roby's work environment as comfortable as possible and that efforts were made to ensure that Roby would not be scheduled to work alone with Schiavone. (SF Par. 42). CW points to evidence that, due to the small number of employees in the area of CW where Roby worked, and Schiavone's position, it was not feasible to create schedules during which Roby and Schiavone never worked

at the same time.  (SF Par. 42).

It is also undisputed that CW admonished its employees to maintain confidentiality concerning the investigation of Roby's allegations of harassment.  (R SF Par. 50).  Roby disputes that fact, but only argues that some supervisors did not follow the admonishment.  (R SF Par. 50).  Roby acknowledges that in late December 2005, she complained to Ziarko and Heaton that Donnie Brown ("Brown") and Gartzke were discussing her allegations of harassment.  (R SF Par. 51-52).  Roby admits that Sack investigated her complaints about Schiavone.  (R SF Par. 53).  Roby also admits that although CW concluded that Brown was not aware of Roby's complaint, CW terminated Gartzke's employment due to his breach of confidentiality.  (R SF Par. 53-55).  Roby also acknowledges that Sack took steps to investigate Roby's assertions that Schiavone was taunting her or staring at her.  (R SF Par. 56).  Based upon the above, CW has pointed to sufficient evidence that shows that CW, upon learning of the allegations of harassment by Schiavone, actively took steps to address the problem and exercised reasonable care in preventing and correcting the harassing behavior.

C.  Failure by Roby to Take Advantage of Corrective Opportunities

CW also contends that Roby failed to take advantage of the corrective

opportunities available to her to address the alleged harassment by Schiavone. Roby admits that CW had the Harassment Policy and that, upon hiring, all employees at CW received a copy of the Harassment Policy. (R SF Par. 7). Roby also admits that she signed an acknowledgment that she received a copy of the Harassment Policy, that she understood the Harassment Policy, and that she agreed to abide by the Harassment Policy. (R SF Par. 15). Thus, both Roby and Schiavone received the Harassment Policy explaining that CW does not condone sexual harassment and that such harassment should be reported. Despite the existence of the Harassment Policy, as explained above, Roby admits that CW management only learned of the alleged harassment by Schiavone when Ziarko overheard Roby's conversation about Schiavone. Roby did not take the first step to complain to management. Rather, the undisputed evidence shows that Ziarko took the initiative and had Roby come to his office so he could address the situation.

It is undisputed that the Harassment Policy contains a provision stating that employees are required to immediately report any harassment. (R SF Par. 6). Roby states in response only that she disputes that CW follows the policy. (R SF Par. 6). CW asserts that although Roby contends that she suffered harassment as early as June 2005, (SF Par. 17, 26-27), Roby did not immediately notify CW of the alleged harassment as is provided in the Harassment Policy. (SF Par. 17). Roby denies that

she made her first complaint in November 2005, contending that Gartzke made a reference about her situation to Ziarko in the fall of 2005. (R SF Par. 17). However, as is explained above, that statement was not a complaint about harassment and Roby has not shown that Gartzke's alleged comment would be admissible. Also, it is undisputed that under the terms of the Harassment Policy, Roby, who had been aware of the harassment, was obligated to report it immediately. Nothing absolved Roby of that responsibility even if another employee had made references to it when speaking to Ziarko.

Roby in fact admits that, before November 2005, she knew that she was being harassed and purposefully did not report it. (Ans. SJ 13). Roby states that she did not report it because she needed her job and at that point the harassment had only been verbal. (Ans. SJ 13). However, CW cannot be held responsible for such harassment if it was never informed of the harassment. Also, had Roby informed CW of the early oral harassment, CW might have been able to take steps sooner and prevent the following alleged physical harassment.

Roby also contends that in September 2005, after she returned from maternity leave, Schiavone stood too close behind her. (Roby Dep. 46). However, although Roby recalled the incident during her deposition, it is undisputed that Roby never informed CW management of the alleged incident while she was employed at CW.

(R SF Par. 60); (Roby Dep. 46). Thus, Roby failed to properly alert CW of the September 2005 incident.

The allegations against Schiavone involve conduct that has absolutely no place in the workplace and is reprehensible. The question remains, however, whether Roby properly notified such conduct to CW management. The undisputed evidence, clearly shows that Roby failed to immediately notify CW of the alleged harassment against her even though such notification is required in the Harassment Policy. The undisputed evidence thus shows that Roby, despite being instructed as to and cognizant of the Harassment Policy, never took advantage of the Harassment Policy and failed to properly inform CW management of the harassment. The undisputed evidence shows that the management at CW only learned of the alleged harassment by Schiavone when Ziarko overheard comments made by Roby. Thus, the undisputed evidence clearly shows that Roby unreasonably failed to notify management to allow CW management to address the alleged harassment by Schiavone. Based on the above, no reasonable trier of fact could find in favor of Roby relating to the hostile work environment claim and we grant CW's motion for summary judgment on the hostile work environment claim.

## II.  Title VII Retaliation Claim

CW moves for summary judgment on the Title VII retaliation claim.  Title VII prohibits employers from "discriminat[ing] against" an employee, because she has "opposed any practice made an unlawful employment practice by" Title VII.  42 U.S.C. §2000e-3(a).  A plaintiff can prove a retaliation claim under either the direct method of proof or the indirect method of proof.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006).

### A.  Direct Method of Proof

Under the direct method of proof, a plaintiff is required to either (1) "'present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that [s]he engaged in protected activity (filing a charge of discrimination) and *as a result* suffered the adverse employment action of which [s]he complains'" or (2) present sufficient indirect evidence that creates a "'convincing mosaic of circumstantial evidence.'"  *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902 (7th Cir. 2006)(quoting in part *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002) and *East-Miller v. Lake County Highway Dept.*, 421 F.3d 558, 564 (7th Cir. 2005))(emphasis in original).

In the instant action, Roby argues that she can proceed under the indirect method of proof and does not argue that she can proceed under the direct method of proof.   (Ans. SJ 14).   Roby fails to identify sufficient evidence that could indicate that she was constructively discharged or that CW took any adverse actions against Roby because she complained about harassment by Schiavone.   Rather the undisputed evidence clearly illustrates the reasonable efforts by CW to correct the problem and accommodate Roby for further employment at CW.   The totality of the evidence does not establish a convincing mosaic of retaliation.   Thus, Roby cannot proceed under the direct method of proof.


B.  Indirect Method of Proof

Roby contends that she can proceed under the indirect method of proof. Under the indirect method of proof for a Title VII retaliation claim, the plaintiff must establish a *prima facie* case of retaliation by showing that: "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; (3) she met her employer's legitimate expectations, i.e., she was performing her job satisfactorily; and (4) she was treated less favorably than some similarly situated employee who did not engage in statutorily protected activity." *Argyropoulos v. City of Alton*, 2008 WL 3905891, at *6 (7th Cir. 2008)(quoting *Burlington N. & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53, 68 (2006) and *Robinson v. Shell Oil Co.,* 519 U.S.

337, 346 (1997) for the proposition that "[t]he anti-retaliation provision operates to

'prevent employer interference with unfettered access to Title VII's remedial

mechanisms . . . by prohibiting employer actions that are likely to deter victims of

discrimination from complaining to the EEOC, the courts, or their employers'").

### 1.  Failure to Address Legitimate Non-Discriminatory Reason/Pretext

Roby's arguments as to her Title VII retaliation claim on their face fail to

show that she can defeat CW's motion for summary judgment under the indirect

method of proof.  Roby argues in her answer to the motion for summary judgment

only that Roby has pointed to sufficient evidence to establish a *prima facie* case of

Title VII retaliation.  (Ans. SJ 14).  However, Roby fails to provide any arguments or

supporting law relating to the legitimate non-discriminatory reason/pretext analysis.

(Ans. SJ 14-15).  If a plaintiff establishes a *prima facie* case, the burden shifts to the

defendant to provide a "legitimate, non-discriminatory reason for the adverse

employment action."  *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008).  Once the

defendant provides such a reason, the burden shifts back to the plaintiff to

"demonstrate that the employer's reason is pretextual."  *Id.*

In the instant action, there is no evidence that CW took "adverse" action

against Roby.  CW also contends that it made every effort to address Roby's

concerns about the alleged harassment, and continued to employ Roby and listed her

on the work schedule, but CW had no option but to ultimately terminate Roby's

employment because Roby decided to abandon her job.  Roby fails to provide any

argument or even supporting law regarding whether CW's reason is a pretext.  In

addition, to the extent that Roby indicated in her deposition and argues in her answer

to the instant motion that she did not understand that she was not fired in January

2006 or that the situation was "confusing," (Ans. SJ 10), or that there was other

confusion relating to her harassment complaints, such evidence does not show that

CW's reason was a pretext for unlawful retaliation.  *See Sublett v. John Wiley &

Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)(stating that "[p]retext is a 'lie,

specifically a phony reason for some action'")(quoting in part *Russell v. Acme-

Evans, Co.*, 51 F.3d 64, 68 (7th Cir. 1995)).  Roby has not pointed to sufficient

evidence that shows that CW's explanation for its actions were motivated by a

retaliatory purpose, are unworthy of credence, or that the reason was a lie.  *See

Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410-11 (7th Cir.

1997)(stating that the courts "do not sit as a kind of 'super-personnel department'

weighing the prudence of employment decisions made by firms charged with

employment discrimination" and that "[t]hus, when an employer articulates a reason

for discharging the plaintiff not forbidden by law, it is not [a court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination"). Thus, even if we were to accept Roby's arguments concerning her *prima facie* case, Roby fails to show that she can prevail under the indirect method of proof on her retaliation claim.

2. *Prima Facie* Case of Title VII Retaliation

We also note that even if Roby had adequately addressed the legitimate non-discriminatory reason/pretext analysis, Roby did not point to sufficient evidence to establish a *prima facie* case. As indicated above, Roby did not point to sufficient evidence that shows that CW terminated her employment in January 2006 or that Roby was constructively discharged. Roby also contends that after she complained about Schiavone, he would stare at her, taunt her, and told her nothing would happen to him because he is a "Mason." (R SF Par. 56). However, Roby has not shown that such conduct even if true could support the adverse action element of her *prima facie* case. Roby has not pointed to sufficient evidence that shows that any action taken against Roby could be deemed an adverse action to support her retaliation claim. In addition, Roby fails to establish a *prima facie* case because she fails to provide details explaining why the other employees that she contends were treated differently

were similarly situated to Roby.  *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007)(stating that for the similarly situated analysis courts should consider factors such as "whether the employees 1) had the same job description; 2) were subject to the same standards; 3) were subject to the same supervisor; and 4) had comparable experience, education, and other qualifications").  Therefore, based on the above, we grant CW's motion for summary judgment on the Title VII retaliation claim.

## CONCLUSION

Based on the foregoing analysis, we grant CW's motion for summary judgment in its entirety.


Samuel Der-Yeghiayan
United States District Court Judge


Dated:  September 11, 2008